02-11-333-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00333-CV

 

 


 
 
 In the Interest C.L.D. and C.R.D., Children
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


 

 

----------

FROM THE 323rd
District Court OF Tarrant COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

 

Appellant
A.B. (Mother) appeals the trial court’s judgment terminating her parental
rights to her two children, C.L.D. and C.R.D.[2]  After a bench trial, the
trial court found that Mother had engaged in conduct or knowingly placed the
children with persons who had engaged in conduct that endangered the physical
or emotional well-being of the children and had knowingly placed or knowingly
allowed the children to remain in conditions or surroundings that endangered
their physical or emotional well-being.[3]  The trial court also
found that termination of Mother’s parental rights would be in the children’s
best interest.  In her sole issue, Mother argues that the evidence is legally
and factually insufficient to support the trial court’s best interest finding.  Mother
does not challenge the trial court’s statutory endangerment findings.  We
affirm.

II.  Background

 

Mother had a Department of Family and Protective
Services (the Department) referral in January 2007 concerning her oldest child.[4]
 Mother was “extremely intoxicated” and began fighting with her mother, who
called the police.  When police arrived, Mother’s hands were bleeding, and the
police report stated that Mother had shaken her child and broken several
windows in the home.  The Department learned in January 2007 that Mother had
been diagnosed with major depression and bipolar disorder; Mother was not
taking her medication, and she “admitted to drinking to intoxication.”  In
March 2007, Mother was arrested for striking her boyfriend’s child while intoxicated. 
Mother was later convicted for injury to a child.

In April 2007, the Department received a referral that
Mother had her oldest child with her and was about to walk onto Interstate 30
in Arlington to kill herself.  Mother told the investigator that she was not
holding her child while walking on I-30, but the Department believed otherwise
because Mother’s boyfriend had arrived and was able to get their child off the
highway and away from Mother.  Mother remained on the highway until police
arrived.

Mother attempted suicide in June 2007 while in jail.  She
was in and out of jail throughout 2007 and 2008, and she received Mental
Health/Mental Retardation (MHMR) services while in jail.  After leaving jail in
March 2008, Mother voluntarily relinquished her parental rights to her oldest
child.

In December 2008, Mother gave birth to C.L.D.  The
Department was concerned about Mother’s drinking and her mental health
stability, and Mother began working with an MHMR doctor soon thereafter.  However,
the Department received a new referral in March 2009 concerning Mother’s
drinking.

The Department offered services to Mother and provided
transportation for her to work the services.  Mother submitted to a drug and
alcohol assessment and admitted that she had a drinking problem, and she made
“quite a bit of progress” on her service plan during April and May 2009.  She began
attending a rehabilitation program and taking her depression medication.

Mother relapsed in June 2009.  She agreed in July 2009
to attend a ninety-day, inpatient drug and alcohol program and to bring C.L.D.
with her to the program, but Mother stayed for only about thirty days.  Even
so, Mother had worked several parts of her service plan, had located an
apartment, and was showing signs of improvement by early-Fall 2009.  By
November 2009, Mother seemed to be staying away from drugs and alcohol, and the
pending case was closed in December 2009.

In June 2010, Mother drank alcohol while eight months
pregnant with C.R.D.  Mother told an investigator that she would drink alcohol
because of arguments with Father and because “she just wanted to have a good
time.”  In October 2010, police were called to Mother and Father’s apartment
because they had gotten into a fight.  When interviewed later about the October
2010 incident, Mother said that neither child was in the apartment, that she
was upset with Father for selling drugs, and that Father punched her in the
side of her head.  Mother also said that she pulled a knife to defend herself
from Father.

The apartment complex management decided to evict Mother
from her apartment the day after her altercation with Father, and apartment
manager Edna Garcia went to Mother’s apartment with another manager to serve
her with an eviction notice.  Garcia testified that she and the other manager
could hear a baby screaming inside the apartment.  They knocked numerous times
“really, really hard,” but no one answered.  They retrieved a key to Mother’s
apartment, entered the apartment, and saw Mother asleep on a mattress on the
floor.  There was an infant, C.R.D., next to her screaming.  C.L.D., who
appeared to Garcia to be fifteen to seventeen months old, was also in the
apartment eating infant formula out of a can, with crusted milk all in his
mouth and his hands.  Garcia testified that she had a very difficult time
waking Mother and that Mother appeared to be “high on drugs” when she finally
awoke.  The Department removed the children the same day.

Department
caseworker Abigail Flores developed a service plan for Mother in November 2010
that required Mother to submit to drug and psychological assessments and to
attend individual counseling and domestic violence counseling.  The service
plan also required that Mother address her mental health issues with services
provided by MHMR because Mother had reported to Flores that she heard voices.  Through
MHMR, Mother would have access to psychiatrists, medication management, and
social workers.  Flores testified that Mother only made one phone call to MHMR
two months before trial and did not otherwise engage with MHMR.

Flores
testified that she provided Mother with bus passes to help her attend her
appointments.  Mother submitted to a psychological assessment but did not submit
to a drug assessment.  Mother passed each of her drug tests during the case and
completed parenting classes, but she attended only one of twelve domestic
violence counseling sessions.  Mother was also discharged several times from
individual counseling for nonattendance,[5]  and she failed to
maintain stable housing during the pendency of the case.

Flores
testified that Mother’s interaction with the children is appropriate, that she
brings them things during visitations, and that she is bonded to the children.  However,
Mother missed the last few visitations before trial.  Flores testified that
Mother had not shown that she could take advantage of the services available to
her, and she estimated that Mother completed twenty-five to thirty percent of
her service plan.  Flores also testified that termination of Mother’s parental
rights is in the children’s best interest.

Mother’s
father testified that he will support Mother and that she has not been drinking
the past three or four months.  He testified that he will take her to
appointments, but he agreed that he cannot force Mother to work her services.  He
also agreed that Mother needs help through MHMR and that she is not an
appropriate parent when she is drinking, but he also testified that termination
of Mother’s parental rights is not in the children’s best interest.

The
children are together in foster care, and they have been in their current
foster home for approximately five months.  Flores said that the children are
bonded to each other and that C.L.D. will console C.R.D. when C.R.D. is upset
or needs something.  Neither child has any developmental needs that require
special therapeutic intervention, but Early Childhood Intervention specialists
recently advised Flores that they intended to begin speech therapy with C.L.D.

Flores testified that the children are doing really well
in the foster home and that the current foster parents intend to adopt the
children if Mother’s parental rights are terminated.  C.L.D. has become more
open and verbal; he was “really reserved and really quiet” when he was
initially placed in foster care, and he is “kind of coming out of that.”  C.R.D.
“is attached.  He’s closer to the foster mom.  When she’s not inside, they look
for her.”  Flores testified that C.R.D. often sits in the foster mother’s lap
or very near her.  Flores also positively described the children’s interactions
with the foster father.  Flores listed the subsidies and services that will be
available to the foster parents if they adopt the children.

III.  Standards of
Review

 

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001; In re
J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex. Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625, 629 (Tex. App.—Fort
Worth 2000, pet. denied) (op. on reh’g).  In this case, Mother does not
challenge the trial court’s section 161.001(1)(D) and (E) findings.  Thus, we
only address the sufficiency of the evidence concerning the trial court’s best
interest finding.

Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also id. § 161.206(a).  Evidence is clear and
convincing if it “will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations sought to be established.”  Id.
§ 101.007 (West 2008).  Due process demands this heightened standard
because termination results in permanent, irrevocable changes for the parent
and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In
re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for
termination and modification).

In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our own.  In
re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the termination of the parent-child relationship would be in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89
S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

IV.  Best Interest

 

Mother
argues in her sole issue that the evidence is legally and factually
insufficient to support the trial court’s finding that termination of her
parental rights is in the children’s best interest.

A.   Applicable Law

 

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(A)     the desires of the child;

(B)     the emotional and physical
needs of the child now and in the future;

(C)     the emotional and physical
danger to the child now and in the future;

(D)     the parental abilities of
the individuals seeking custody; 

(E)     the programs available to
assist these individuals to promote the best interest of the child;

(F)     the plans for the child by
these individuals or by the agency seeking custody;

(G)     the stability of the home
or proposed placement;

(H)     the acts or omissions of
the parent which may indicate that the existing parent-child relationship is
not a proper one; and

(I)      any excuse for the acts or
omissions of the parent.

Holley v. Adams, 544 S.W.2d 367,
371–72 (Tex. 1976) (citations omitted).

 

These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient
in a particular case to support a finding that termination is in the best
interest of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.

B.   Discussion

 

At the time of trial in August 2011, C.L.D. was two
years old, and C.R.D. was one year old.  The children are too young to have
expressed their desires, but the evidence reflects that they have a bond with
Mother.  Even so, the children are doing well in foster care.  C.L.D. was
scheduled to begin speech therapy, but the children do not otherwise have
developmental needs that require special therapeutic intervention.  The
children have bonded with their foster parents, particularly their foster
mother, and C.L.D. has changed away from the reserved and quiet manner he
exhibited upon placement in foster care.  The Department’s plan for the
children is adoption by their current foster family, and the trial court heard
testimony about the propriety of the foster family and the programs and
services that will be available to the foster family after adoption.

In contrast, Mother has a history of mental health
problems and instability, including incidents of violence with her oldest
child, her mother, and Father; striking her boyfriend’s child; attempting
suicide; and drinking alcohol to extreme intoxication.  The Department
attempted to work with Mother beginning in 2007, and although Mother made
progress during certain intervals, she had completed less than half of the
services offered to her during the year before the termination trial.  Although
Mother had completed parenting classes, Flores testified that Mother had not
demonstrated an ability to take advantage of the services available to her.

Applying
the appropriate standards of review, we hold that the evidence is legally and
factually sufficient to support the trial court’s finding that termination of
Mother’s parental rights is in the children’s best interest.  See H.R.M.,
209 S.W.3d at 108 (discussing factual sufficiency standard of review); J.P.B.,
180 S.W.3d at 573 (discussing legal sufficiency standard of review).  We
therefore overrule Mother’s sole issue.

V.  Conclusion

 

Having overruled Mother’s sole issue, we
affirm the trial court’s judgment.

 

 

 

 

ANNE GARDNER
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; DAUPHINOT and GARDNER, JJ.

 

DELIVERED:  July 26, 2012  








 









[1]See Tex. R. App. P. 47.4.





[2]The trial court also
terminated the parental rights of C.D. (Father), but Father has not appealed
the judgment.





[3]See Tex. Fam. Code
Ann. § 161.001(1)(D), (E) (West Supp. 2012).





[4]Mother’s parental rights
to her oldest child are not at issue in this appeal; she voluntarily
relinquished her parental rights to that child in 2008.





[5]The Department referred
Mother to Positive Influences for individual counseling.  Mother was discharged
after missing the first three appointments.  The Department made three
additional attempts to have Mother attend counseling through Positive
Influences, but Mother was discharged each time for nonattendance.